CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 466-3090
Fax: (415) 513-4475
Email: joe@creitzserebin.com

James A. Walcheske*
Scott S. Luzi
Paul M. Secunda*
* admitted pro hac vice
WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| BRIAN REICHERT, DEREK DEVINY individually, and as representatives of a Class of Participants and Beneficiaries of the Juniper Networks, Inc. 401(k) Plan, <br><br> Plaintiffs, <br><br> v. <br><br> JUNIPER NETWORKS, INC., and <br><br> BOARD OF DIRECTORS OF JUNIPER NETWORKS, INC., and <br><br> INVESTMENT COMMITTEE OF JUNIPER NETWORKS, INC. and <br><br> JOHN DOES 1-30, <br><br> Defendants. | Case No: 3:21-cv-06213-JD <br><br><br> **CLASS ACTION AMENDED COMPLAINT FOR CLAIMS UNDER ERISA, 29 U.S.C., § 1132(a)(2)** |

COMES NOW Plaintiffs, Brian Reichert and Derek Deviny, individually and as representatives of a Class of Participants and Beneficiaries on behalf of the Juniper Networks, Inc. 401(k) Plan (the "Plan"), by and through their counsel, WALCHESKE & LUZI, LLC, and CREITZ & SEREBIN LLP, as and for a claim against Defendants, allege and assert to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## **INTRODUCTION**

1.      The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.      The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting retirement plan service providers ("RPSP") and investments *as well as* a continuing duty to monitor fees and expenses of selected RPSP and investments and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment."). It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan, *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.      Defendants, Juniper Networks, Inc. ("Juniper"), the Board of Directors of Juniper Networks, Inc. ("Board Defendants"), the Investment Committee of Juniper Networks, Inc. ("Investment Defendants"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries, as they exercises discretionary authority or discretionary control over the 401(k) defined contribution

pension plan – known as the Juniper Networks, Inc. 401(k) Plan (the "Plan") – that it sponsors and provides to its employees.

4. Plaintiffs allege that during the putative Class Period (August 11, 2015 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other Participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for retirement plan services ("RPS"); (2) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (3) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; (4) authorizing the Plan to pay unreasonably high fees for managed account services; and (5) failing to disclose to Participants necessary Plan information for them to make informed Plan investment decisions.

5. These objectively unreasonable RPS, managed account, and investment management fees, cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiffs, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against the market rates, applicable benchmarks, and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for RPS, managed accounts, and investment management.

6. To remedy, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## **JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

8. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9. Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10. In conformity with 29 U.S.C. § 1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

**PARTIES**

11. Plaintiff Brian Reichert is a resident of the State of Wisconsin and currently resides in Madison, Wisconsin, and during the Class Period, is a participant in the Plan under 29 U.S.C. § 1002(7).

12. Plaintiff Reichert was employed by Juniper from January 2021 through August 2021, in the position of Staff Software Engineer. He previously worked in the same position for Apstra, a company that was recently acquired by Juniper.

13. Plaintiff Derek Deviny is a resident of the State of California and currently resides in Oceanside, California, and during the Class Period, is a participant in the Plan under 29 U.S.C. § 1002(7).

14. Plaintiff Deviny has worked for Advanced Juniper Technical Assistance on the MX router team since 2009 and remains a current Juniper employee.

15. Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their own Plan account in which they are still Participants, those injuries are fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

16. It is well settled, moreover, that recovery may be had for the Class Period before Plaintiffs personally suffered injury, as that turns on ERISA § 502(a)(2) on which their claim rests. This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA § 409 protect the entire Plan. Courts have recognized that a plaintiff with Article III standing, like Plaintiffs, may proceed under ERISA § 502(a)(2) on behalf of the Plan and all participants in the Plan. Plaintiffs may seek relief under ERISA § 502(a)(2) that sweeps beyond their own injury and beyond any given investment they hold as Participants in the Plan.

17. The named Plaintiffs and all Participants in the Plan suffered ongoing financial harm as a result of Defendants' imprudent and unreasonable Plan investment and service provider fee decisions.

18. The named Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the RPS fees, managed account fees, investment alternatives that are comparable to the investments offered within the Plan, total cost comparisons to similarly-sized Plans, and information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

19. The named Plaintiffs and all Participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Plans. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting and monitoring the Plan's RPSP) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth below.

20. Defendant Juniper Networks, Inc. ("Juniper") provides products, solutions, and services that simplifies the process of transitioning to a secure and automated multi-cloud environment to enable secure, AI-driven networks. Its principal headquarters are located at 1194 North Mathilda Avenue, Sunnyvale, California 94089-1206, and the Plan is located at 1133

Innovation Way, Sunnyvale, CA 94089-1206. In this Complaint, "Juniper" refers to the named Defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

21. Juniper acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and scope of their business. Juniper appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Juniper is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

22. The Plan Administrator of the Plan is the Investment Committee of Juniper Networks, Inc. ("Committee"), located at 1133 Innovation Way, Sunnyvale, CA 94089-1206. As the Plan Administrator, the Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

23. The Committee in its Plan Administrator capacity, as well as individuals who carried out Plan functions (John Does 11-20), are collectively referred to herein as the "Committee Defendants."

24. To the extent that there are additional officers and employees of Juniper who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Juniper officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

25. The Plan is a Section 401(k) "defined contribution" pension Plan under 29 U.S.C. §§ 1102(2)(A) and 1002(34), meaning that Juniper's contribution to the payment of Plan costs is

guaranteed but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the participants.

26. The Plan currently has about $1,411,936,460 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor its RPSP and each investment option to ensure they were a prudent choice.

27. With 6,860 participants in 2019, the Plan had more participants than 99.73% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $1,411,936,460 in assets in 2019, the Plan had more assets than 99.89% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

### ERISA'S FIDUCIARY STANDARDS

28. ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as a Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the Plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

29. With certain exceptions, 29 U.S.C. § 1103(c)(1) provides in relevant part:

[T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

30. Title 29 U.S.C. § 1109 provides in relevant part:

Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

31. Under ERISA, fiduciaries that exercise any authority or control over Plan assets, including the selection of Plan investments and service providers, must act prudently and for the exclusive benefit of participants in the Plan, and not for the benefit of third parties including service providers to the Plan such as RPSP and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. *See* DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A.

32. "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each investment* option available to Plan Participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution Plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1828-29.

33. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies

for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7.

34. 29 U.S.C. § 1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. § 1109.

## DEFINED CONTRIBUTION INDUSTRY

35. Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals. Employees with money in a plan are referred to as "Participants."

36. As of September 2020, Americans had approximately $9.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. See INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020), available at https://www.ici.org/research/stats/retirement/ret_20_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. See BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), available at http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

37. Failures by ERISA fiduciaries to monitor fees and costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

38. The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment

underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

**Retirement Plan Services (RPS)**

39.     Defined Contribution plan fiduciaries virtually always hire service providers to deliver a retirement plan benefit to their employees. There is a large group of national retirement plan services providers ("RPSP"), commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of virtually all retirement plans. In some cases, these RPSP have developed all the capabilities "in-house," while in other cases, the RPSP outsource some of the required services to other service providers.

40.     These RPSP deliver all the essential recordkeeping and related administrative ("RK&A") services through standard bundled offerings.

41.     There are two types of essential RK&A services provided by all RPSP. For large plans with substantial bargaining power (like the Plan here), the first type, "Bundled RK&A," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RK&A services include, but are not limited to, the following standard services:

     a.   Recordkeeping;

     b.  Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

     c.  Administrative Services related to converting a plan from one RPSP to another RPSP;

     d.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other

communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund (if needed);

f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

42. The second type of essential RK&A services, hereafter referred to as "Ad Hoc RK&A" services, provided by all RPSP, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "Ad Hoc RK&A" services typically include, but are not limited to, the following:

a. Loan Processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

d. Processing of Qualified Domestic Relations Orders.

43. For very large plans with about 7,000 participants or more, like the Plan here, any minor variations in the way that these two types of essential RK&A services, as well as any other RK&A services included in the bundled offering of RK&A services, are delivered has *no material impact on the fees charged by RPSP*. This fact is confirmed by the practice of all RPSP quoting fees for the Bundled RK&A services on a per participant basis without regard for any individual differences in type of level of services requested -- which are treated by the RPSP as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RK&A services.

44. The combination of Bundled RK&A Services and Ad Hoc RK&A services can be referred to as retirement plan services ("RPS"). The vast majority of fees earned by RPSP through

providing RPS typically come from the bundled fee for providing the Bundled RK&A services as opposed to the Ad Hoc RK&A services.

45. The Plan's 404a-5 participant fee disclosures makes clear that the Plan here had a standard package of RPS that all mega retirement 401(k) plans have (more than a billion dollars in assets), i.e., Bundled RK&A Services and Ad Hoc RK&A services as described. The RPS received by the Juniper Plan was identical or substantially similar in terms of the quality, type, and level of services that almost all comparable plans with similar numbers of participants and/or assets under management received from the same or similar RPSPs.

46. Because RPSP at this level of plan size offer the same bundles and combinations of services as their competitors, the market for defined contribution RPS has become increasingly price competitive, particularly for large plans that, like the Plan here, have a sizable number of participants and a large amount of assets.

47. Over the past twenty years, the fees that RPSP have been willing to accept for providing RPS has significantly decreased. RPSP are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

48. By the start of and during the entire Class Period, the level of fees that RPSP have been willing to accept for providing RPS has stabilized, and has not materially changed for large plans, including the Plan here. In other words, reasonable RPS fees paid in 2019 or 2020 are representative of the reasonable fees for RPS during the entire Class Period.

49. The underlying cost to a RPSP of providing the RPS to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

50. The incremental cost for a RPSP to provide RPS for a participant's account does not materially differ from one participant to another and is not dependent on the balance of the participant's account.

51. RSPS for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.

52. Therefore, while the total cost to an RPSP to deliver RPS increases as more participants join the Plan, the cost per participant to deliver the RPS decreases.

53. Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RPSP.

54. Since at least the early 2000s, Defendants should have been aware of this cost structure dynamic for RPSP.

55. Sponsors of defined contribution plans contract for RPS separately from any contracts related to the provision of investment management services to plan participants.

56. The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of RPS performed by the RPSP on behalf of the investment manager.

57. As a result, RPSP often make separate contractual arrangements with mutual fund providers. For example, RPSP often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing."

58. For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RPSP 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."[1]

[1] The revenue sharing rates received by recordkeepers from asset managers are generally publicly available and are often provided by the recordkeepers to their custody and trading partners who in turn often provide them to 3(38) and 3(21) fiduciary services providers. Recordkeepers also provide them to retirement plan advisors, consultants, and plan fiduciaries upon request. Recordkeepers are also required via regulation to provide the revenue sharing rates to their retirement plan clients. Recordkeepers generally do not, however, disclose revenue sharing rates to plan participants. Revenue sharing rates used in this complaint are obtained from publicly available sources. Because the

59. In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RPS. The difference between the total expense ratio and the revenue sharing is known as the "Net Investment Expense to Retirement Plans."

60. In the context of defined contribution plans, when a Plan adopts prudent and best practices, the Net Investment Expense to Retirement Plans is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

61. RPSP typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

62. Regardless of the pricing structure that the plan fiduciary negotiates with any service provider, the amount of compensation paid to service providers, including the RPSP, must be reasonable.

63. As a result, plan fiduciaries must understand the total dollar amounts paid to their service providers, including the RPSP, and be able to determine whether the compensation is reasonable by understanding what the market is for the RPS received by the Plan.

64. During the Class Period, Defendants knew and/or were aware that a Plan with more participants can and will receive a lower effective per participant RPS fee when evaluated on a per participant basis.

65. During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant RPS fee when evaluated on a per participant basis.

**Investments**

66. Plan fiduciaries of a defined contribution Plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan Participants.

67. The primary purpose in selecting Plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing

revenue sharing rates are negotiated through a separate contract between asset managers and recordkeepers, they can differ from rates disclosed in prospectuses.

diversified investment alternatives.

68. In many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes. When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, RPS services.

69. As a result, when a prudent plan fiduciary can select from among several alternative share classes of the identical investment option, the prudent plan fiduciary selects the share class that provides the lowest Net Investment Management Expense to Retirement Plans.

**Managed Account Service Fees**

70. During the Class Period, Defendants selected and made available to Plan Participants managed account services.

71. In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his account in a portfolio of preselected investment options.

72. Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

73. The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

74. In practice, however, there is often little to no material customization provided to the vast majority of plan participants which results in no material value to most, if not all, participants relative to the fees paid.

75. In fact, many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

76. Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $100,000 of assets may be charged a certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

77. In other words, the cost to manage the account of a participant with $100,000 is the same as the cost to manage the account of a participant with $500,000. The economies of scale for manages account services are even greater than for RPS.

78. The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

79. For at least the past decade, larger plans have been able to negotiate multiple facets of the fees charged by managed account providers such as both the asset levels at which a particular fee tier starts (e.g., the highest tier applies to the first $25,000 versus the first $100,000), as well as the fee rate charged at each asset level.

80. Managed account services are often offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan. In some cases, the covered service provider outsources the investment management services to a third-party provider, e.g., Morningstar, and charges a fee to the plan higher than what the third-party provider charges the covered service provider. In other cases, the covered service provider provides all the services.

81. In many cases, the covered service provider will promote the managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

82. As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service (e.g., an automated time-based dynamic asset allocation creation and rebalancing solution).

83. This industry segment has matured over the past decade and the costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for many years.

84. As with retirement plan service services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will ensure the fees are reasonable compared to what is available in the market for materially similar services.

85. The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the RPSP.

86. Defendants caused Plan Participants to pay excessive fees for the managed account services it made available to Plan Participants by not periodically soliciting bids from other managed account service providers and/or not staying abreast of the market rates for managed account solutions to negotiate market rates.

87. The excessive fees paid by Plan Participants using the managed account service were not warranted and did not provide any material value or benefit to Plan Participants.

## **THE PLAN**

88. During the class period the Plan received RPS from RPSP Fidelity Investments Institutional ("Fidelity").

89. At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management. The fees were also excessive relative to the RPS services received, which were identical or substantially similar in terms of quality, level, and types of

services. These excessive fees led to lower net returns than participants in comparable 401(k) plans enjoyed.

90. During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff and all other Plan Participants, by: (1) failing to monitor the RPS fees paid by the plan to ensure that they were reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive RPS fees, relative to the RPS received; (2) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (3) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; (4) authorizing the Plan to pay unreasonably high fees for managed account services; and (5) failing to disclose to Participants necessary Plan information for them to make informed Plan investment decisions.

91. Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence in violation of 29 U.S.C. § 1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

92. A plan fiduciary is required to fully understand all sources of revenue received by all service providers, including its RPSP. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the services provided.

93. Prudent plan fiduciaries ensure they are paying only reasonable fees for RPS by soliciting competitive bids from other service providers to perform the same type and level of services currently being provided to the plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries.

94. For Plans with as many participants as the Juniper Plan, many RPSP would require only the number of participants while others might require only the number of participants and the amount of the assets to provide a quote.

95. Prudent plan fiduciaries have all of this information readily available and can easily

receive a quote from other RPSP to determine if the current level of RPS fees is reasonable.

96. Having received bids, the prudent plan fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee if necessary.

97. Prudent plan fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

98. After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RPS fee. The employer/plan sponsor can pay the recordkeeping fee on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable RPSP would accept. Usually, however, the employer decides to have the plan (plan participants) pay the RPS fee instead. If the RPS fee is paid by plan participants, the plan fiduciary can allocate the negotiated fee among participant accounts on a per capita or pro-rata basis.

99. If the plan negotiates a per participant revenue threshold of $30.00 for the Bundled RK&A, the plan does not need to require that each participant pay $30.00. Rather, the plan fiduciary could determine that an asset-based fee is more appropriate for plan participants and allocate the Bundled RK&A fee pro rata to participants. For example, a 15,000 participant-plan with a $30.00 revenue threshold would pay $450,000 for RPS. If the plan had $3,000,000,000 in assets, then the $450,000 would work out to 1.5 basis points. Accordingly, the plan fiduciary could allocate the $450,000 to plan participants by requiring that each participant pay 1.5 basis points.

100. In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the RPS do not change but, because of market appreciation and contributions to the plan, the revenue received by the RPSP increases. This structure was historically preferred by RPSP because it allowed them to obtain an increase in revenue without having to ask the client to pay a higher fee.

101. Regardless of the pricing structure, and Plaintiffs state no preference, the plan

fiduciary must ensure that the fees paid to service providers for RPS are reasonable.

102. All of these standards were accepted and understood by prudent plan fiduciaries, including Defendants, at all times during the Class Period.

103. For example, fiduciary best practices based on DOL guidelines, case law, and marketplace experience are as follows:

> 1. Price administrative fees on a per-participant basis.
>
> 2. Benchmark and negotiate recordkeeping and investment fees separately.
>
> 3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
>
> 4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.
>
> . . . .
>
> 7. Review services annually to identify opportunities to reduce administrative costs.[2]

104. Prudent fiduciaries implement three related processes to prudently manage and control a plan's RPS costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) Plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

105. First, a plan fiduciary must pay close attention to the RPS fees being paid by the Plan. A hypothetical prudent fiduciary tracks the RPSP's expenses by demanding documents that summarize and contextualize the RPSP's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

---

[2] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC (2013).

106. Second, to make an informed evaluation as to whether a RPSP or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's RPSP. To the extent that a plan's investments pay asset-based revenue sharing to the RPSP, prudent fiduciaries monitor the amount of the payments to ensure that the RPSP's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

107. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RPS rates that are available. This will generally include conducting a Request for Proposal ("RFP") or Request for Information ("RFI") process at reasonable intervals, and immediately if the plan's RPS expenses have grown significantly or appear high in relation to the general marketplace.

108. By merely soliciting bids from other RPSP, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for similar RPS services and have an idea of a starting point for negotiation. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RPS FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RPS FEES

109. A plan fiduciary must continuously monitor its RPS fees by regularly soliciting competitive bids to ensure fees paid to RPSP are reasonable.

110. During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RPS fees paid to RPSP, including but not limited to Fidelity.

111. During the Class Period, Defendants failed to regularly monitor the Plan's RPS fees paid to RPSP, including but not limited to Fidelity.

112. During the Class Period, Defendants knew or should have known that they must

regularly solicit quotes and/or competitive bids from RPSP, including but not limited to Fidelity, in order to avoid paying objectively unreasonable fees for RPS.

113. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from RPSP, including but not limited to Fidelity, in order to avoid paying unreasonable fees for RPS.

114. During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

115. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

116. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable fees paid for RPS.

117. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

118. During the Class Period and because Defendants failed to regularly monitor the Plan's RPS fees paid to RPSP, including but not limited to Fidelity, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in this process.

119. During the Class Period, given the Plan's objectively unreasonable RPS fees, Defendants engaged in an ineffective fiduciary process in soliciting competitive bids for these services.

120. During the Class Period and because Defendants did not engage in objectively reasonable and/or prudent efforts when paying fees for RPS to RPSP, including but not limited to Fidelity, the RPS fees were significantly higher than they would have been had Defendants engaged in these efforts.

121. From the years 2015 through 2019 and based upon the best publicly available

information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RPS fees illustrating that the Plan had on average 6,770 participants with account balances and paid an average effective annual RPS fee of at least approximately $559,784, which equates to an average of at least approximately $83 per participant. These are the minimum amounts that could have been paid:

## Retirement Plan Services (RPS) Fees

|  | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
|---|---|---|---|---|---|---|
| Participants | 6,742 | 6,824 | 6,708 | 6,715 | 6,860 | 6,770 |
| Est. RPS Fees | $546,127 | $537,674 | $678,840 | $391,350 | $644,930 | $559,784 |
| Est. RPS Per Participant | $81 | $79 | $101 | $58 | $94 | $83 |

122. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RPS fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RPS fees paid by the Plan (as identified in the table above).

### Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500[1]

| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Associated Materials, Llc 401(K) Retirement Plan | 3,639 | $99,814,049 | $179,475 | $49 | ADP | White |
| Hitachi Vantara Corporation Retirement And Savings Program | 3,890 | $680,441,899 | $174,568 | $45 | Fidelity | White |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard | White |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $89,400 | $20 | T. Rowe Price | White |
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | White |

| | | | | | |
|---|---|---|---|---|---|---|
| Mercedes-Benz USA, LLC Employees' Retirement Savings Plan | 5,713 | $572,242,547 | $331,038 | $58 | Voya | White |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | White |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica | White |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| **Juniper Networks, Inc. 401(K) Plan Average Fee** | **6,770** | **$1,131,015,894** | **$543,687** | **$80** | **Fidelity** | **Red** |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica | White |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica | White |
| Waste Connections, Inc. 401k Profit Sharing Plan | 7,923 | $332,567,264 | $455,853 | $58 | Voya | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |

[1]Price calculations are based on 2018 Form 5500 information.

123. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RPS fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RPS fees paid by the Plan (as identified in the table above), with the white data points representing RPS fees that RPS providers offered to (and were accepted by) comparable Plans.



124. From the years 2015 to 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that the Plan paid an effective average annual RPS fee of at least $83 per participant for RPS.

125. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period,

the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RPS fee of around $41 per participant, if not lower.

126. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $559,784 per year in RPS fees, which equated to an effective average of approximately $83 per participant per year.

127. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for RPS of approximately $277,562 per year in RPS fees, which equates to approximately $41 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay almost double what they could otherwise pay for RPS.

128. From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $277,562 per year in RPS fees, which equates to on average approximately $42 per participant per year.

129. From the years 2015 to 2019, and because Defendants did not act in the best interests of the Plan's Participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its Participants a total minimum amount of approximately $1,411,112 in unreasonable and excessive RPS fees.

130. From the years 2015 to 2019 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because

Defendants did not act in the best interests of the Plan's Participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $1,880,872 in RPS fees.

131. Plaintiffs Reichert and Deviny both paid these excessive recordkeeping fees in the form of direct compensation to the Plan and suffered injuries to their Plan accounts as a result.

132. Plaintiff Reichert paid these fees as an investor in the T. Rowe Price Retire 2050 Fund.

133. Plaintiff Deviny paid these fees as an investor in the AB Discovery Value Fund, Fidelity Diversified International Pool, and the Fidelity US Bond Index Fund.

134. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RPS fees it paid to Fidelity.

135. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Fidelity vis-à-vis the fees that other RPS providers would charge, and would have accepted, for the same services.

136. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RPS fees it paid to Fidelity, but Defendants either simply failed to do so, or did so ineffectively given that it paid over 100% higher for RPS fees than it should have.

137. During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Fidelity, it would have realized and understood that the Plan was compensating Fidelity unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan Participants. The fees were also excessive relative to the RPS services received since such services are standard for mega 401(k) plans like the Plan here.

138. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RPS fees than they should have been and/or by

failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties of loyalty and prudence to Plaintiffs and Plan Participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

139. For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments.

140. That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the fees.

141. When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

142. From the perspective of a plan participant, the other critical component of the analysis is the fees. However, the total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

143. As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the RPSP for RPS services as well as the different fee components of the investment options selected to be made available to plan participants.

144. Plan fiduciaries of plans as large as the Defendant's Plan are deemed to be "Institutional Investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

145. In fact, as "Institutional Investors," retirement plans often have the ability to access investment options and service structures that are not available or understood by retail investors such

as individual plan participants like Plaintiffs.

146. For example, minimum investment requirements and other fees or restrictions are routinely waived for large retirement plans and were waived for the Plan's investments.

147. As a result, when a plan fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different share classes and collective trusts and choose the share class or collective trust that is in the best interest of the plan participants. This is especially critical when the pricing structure provides compensation to the RPSP from revenue sharing paid by plan participants as part of the total expense ratio of the investment options selected by the plan fiduciaries.

### THE PLAN PAID UNREASONABLY HIGH FEES FOR IMPRUDENT SHARE CLASSES

148. Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets.

149. There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

150. Large defined contribution plans, such as the Plan here, have sufficient assets to qualify for the lowest cost share classes.

151. A prudent plan fiduciary ensures that a plan selects the share class that provides the greatest benefit to plan participants given the institutional advantages provided to retirement plans in relation to retail investors.

152. The share class that provides the greatest benefit to plan participants is the share class that gives plan participants access to the skill and expertise of the portfolio managers at the lowest net fee for the services of the portfolio manager and is referred to here as the "Net Investment Expense to Retirement Plans."

153. As described in more detail below, choosing the share class that provides the lowest Net Investment Expense to Retirement Plans is always the prudent choice because the use of the share class that provides the lowest Net Investment Expense to Retirement Plans will result in one of the following superior options: 1) The amount of the fee extraction to cover the RPS fee will be lower; or 2) the amount of excess revenue being credited back to Participant accounts is greater.

154. During the Class Period, Defendants knew or should have known that they were required to select the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

155. During the Class Period, Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants.

156. During the Class Period, in many cases Defendants did not use share classes that provide the greatest benefit to plan participants.

157. During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants.

158. The following charts[3] identify Defendants' share class investments during the Class Period vis-à-vis the prudent available alternatives that provided the greatest benefit to Plan Participants:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | Defendants' Plan's Investment Excessive Fees (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | |
| ABSZX | AB Discovery Value Fund Class Z | 0.79% | 0.00% | 0.79% | ABASX | AB Discovery Value A | 1.12% | 0.50% | 0.62% | 27% |
| FTBFX | Fidelity® Total Bond Fund | 0.45% | 0.10% | 0.35% | FEPTX | Fidelity Advisor® Total Bond M | 0.75% | 0.50% | 0.25% | 40% |
| | *Average* | *0.62%* | *0.05%* | *0.57%* | | *Average* | *0.94%* | *0.50%* | *0.44%* | *33.71%* |

---

[3] The expense ratios and revenue sharing rates used in the charts in this complaint were in place in 2019.

159. The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by the Defendants' RPS provider.

160. Based upon data and information reflected in the charts above, the excessive fee paid by Participants during the Class Period as a result of Defendants' failure to use the prudent alternative share class that provided the greatest benefit to Plan Participants was approximately 33%.

161. There is no rational reason for a prudent plan fiduciary to choose an investment option that effectively charges a fee that is approximately 33% higher than an alternative investment option that provides the identical services of the same portfolio manager.

162. During the Class Period, and had Defendants engaged in a prudent process to select the share class of the selected portfolio manager that provides the greatest benefit to Plan Participants, the Plan would not have selected the share classes in the Plan.

163. During the Class Period, and had Defendants engaged in a prudent process, once a portfolio manager had been selected, the Defendants would have selected the share classes listed in the "Prudent Alternative Share Class" column of the chart above.

164. During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to plan participants, the Plan would not have selected the fund in the Plan.

165. During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to plan participants, the Plan would have selected the fund in the chart above.

166. During the Class Period, and had Defendants been acting in the best interests of the Plan's Participants, the Plan would not have selected the share class of the fund in the chart above.

167. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, the Plan would have selected the fund in the "Prudent Alternative Share Class" columns of the chart above.

168. During the entirety of the Class Period, Defendants knew or should have known about the existence of alternative share classes of the same mutual funds currently selected and performed the analysis to determine the share class that provides the greatest benefit to Plan Participants.

169. During the entirety of the Class Period, Defendants knew or should have known to transfer the Plan funds into the share class that provides the greatest benefit to Plan Participants.

170. A hypothetical prudent fiduciary would not select a share class that results in higher fees to Plan Participants when a share class that results in lower fees to Plan Participants is available for the identical portfolio management services.

171. During the entirety of the Class Period, Defendants selected a share class that resulted in higher fees to Plan Participants when a share class of the identical investment option was available that would have resulted in lower fees, to the substantial detriment of Plaintiffs and the Plan's Participants.

172. During the entirety of the Class Period and because Defendants selected a share class that resulted in higher fees when a share class that resulted in lower fees was available to the Plan for the identical investment option, the Plaintiffs and the Plan Participants did not receive any additional services or benefits other than a higher cost for Plaintiffs and the Plan Participants.

173. More specifically, the AB Discovery Value Z (ABSZX), in which Plaintiff Deviny invested, was selected by plan fiduciaries and made available to Participants in the Plan from 2015 through at least 2021.

174. As of December 31, 2019, Plaintiff Deviny and Plan Participants had invested more than $65,373,119 in this investment option. The portfolio managers of this investment option were James W. MacGregor and Erik Turenchalk (MacGregor & Turenchalk). Plan Participants can receive the identical portfolio management services of MacGregor & Turenchalk through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by MacGregor & Turenchalk, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | |
| --- | --- | --- |
| | AB Discovery Value A | AB Discovery Value Z |
| Share Class | A | Z |
| Investment Advisor | AllianceBernstein | AllianceBernstein |
| Portfolio Managers | James W. MacGregor, Erik Turenchalk | James W. MacGregor, Erik Turenchalk |
| Ticker | ABASX | ABSZX |
| Portfolio Management Fee | 0.75% | 0.75% |
| Total Expense Ratio | 1.12% | 0.79% |
| Revenue Sharing Credit | 0.50% | 0.00% |
| Net Investment Expense to Retirement Plans | 0.62% | 0.79% |

175. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by the Defendants' RPS provider.

176. In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of RPS.

177. As a result, the fee paid for the portfolio management services of the portfolio managers MacGregor & Turenchalk to pursue the identical investment strategy with the same goals, objectives, and risk profile is the "Net Investment Expense to Retirement Plans" set forth in the bottom row.

178. As illustrated in the chart above, the AB Discovery Value A (ABASX) has the lowest "Net Investment Expense to Retirement Plans" at 0.62%. Despite the Total Expense Ratio being higher, the AB Discovery Value A (ABASX) provides the greatest benefit to Plan Participants because the 0.50% in revenue sharing that is allocable to RPS services is a credit that is returned to the participants directly or used as a credit against the RPS fee. If the 0.50% allocable to RPS services exceeds the actual RPS fee, then the excess can also be returned to the Plan and its Participants.

179. During the Class Period, Plan Participants would have received the lowest possible fee for the portfolio management services of MacGregor & Turenchalk if invested in the AB Discovery Value A (ABASX).

180. When two identical service options are readily available (in this case the portfolio management services of MacGregor & Turenchalk) and would be known as part of the standard of care related to selecting and monitoring investment options, a prudent plan fiduciary ensures that the least expensive of those options is selected.

181. A prudent plan fiduciary understands that the higher "sticker" price of the RPS fee portion of the expense ratio is not relevant since the RPS service provider returns excess revenue to the Plan and its Participants.

182. The DOL requires plan fiduciaries to understand all the fees related to all the various services provided to the Plan and its participants. By selecting an investment option that charges more for identical portfolio management services, the Defendant plan fiduciaries breached their duty.

183. As illustrated in the chart below, which is based on the $65,373,119 that the Plan invested in AB Discovery Value Z (ABSZX) as of December 31, 2019, because Defendants did not select the share class that provided the greatest benefit to Plan Participants, AB Discovery Value A (ABASX), Defendants caused substantial monetary damage and detriment to Plaintiffs and the Plan's Participants.



184. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period.

185. A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on a quarterly basis, which would have identified and selected the share class that provided the greatest benefit to Plan Participants.

186. A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on a quarterly basis, would have identified the share class that provided the greatest benefit to Plan Participants, and would have transferred the Plan's investments into the prudent share classes at the earliest opportunity.

187. During the entirety of the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on a quarterly basis; 2) did not identify

the prudent share classes available to the Plan; and 3) did not transfer the Plan's investments into this prudent share class at the earliest opportunity.

188. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to the Plan's Participants through 2019 in the amount of approximately $1,037,417 and as detailed in the following chart:

| Actual Investment Lineup | | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 |
| Net Investment Expense to Retirement Plans | $3,450,123 | $3,519,256 | $4,519,451 | $3,764,827 | $4,540,099 |
| Prudent Alternative Share Class | | | | | |
| Net Investment Expense to Retirement Plans | $3,313,577 | $3,358,965 | $4,342,716 | $3,625,168 | $4,387,884 |
| Est. Investment Damages | $136,546 | $160,291 | $176,735 | $139,659 | $152,215 |
| Compounding Percentage (VIIIX) | | 11.95% | 21.82% | -4.41% | 31.48% |
| Est. Cumulative Investment Damages | $136,546 | $313,154 | $558,218 | $673,260 | $1,037,417 |

189. During the entirety of the Class Period, and by failing to recognize that the Plan was invested in a share class that resulted in higher fees when a share class that resulted in lower fees to Plan Participants was available for the same investment, and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiffs and the Plan Participants.

### DEFENDANTS' INVESTMENTS IN THE PLAN

190. A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

191. While higher-cost mutual funds may outperform a less-expensive option over the short term, they rarely do so over a longer term. See Jonnelle Marte, *Do Any Mutual Funds Ever Beat*

*the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); see also *Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("[L]ong-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

192. Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

193. During the Class Period, the chart below identifies several investment options that Defendants selected and/or made available to Plan Participants as compared to prudent alternative and less expensive options that were also available for the Plan to place in the 401(k) investment menu for Plan participants.

| Defendants' Investment | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| ABSZX | AB Discovery Value Fund Class Z | 0.79% | 0.00% | 0.79% | VMVAX | Vanguard Mid-Cap Value Index Admiral | 0.07% | 0.00% | 0.07% | 1029% |
| RWIGX | American Funds Capital World Growth & Income Fund R6 | 0.42% | 0.00% | 0.42% | VTWIX | Vanguard Total World Stock Index I | 0.08% | 0.00% | 0.08% | 425% |
| RFNGX | American Funds Fundamental Investors Fund R6 | 0.28% | 0.00% | 0.28% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 0.00% | 0.02% | 1767% |
| DFCEX | DFA Emerging Market Core Equity Portfolio Institutional Class | 0.48% | 0.00% | 0.48% | FPADX | Fidelity® Emerging Markets Idx Instl Prm | 0.08% | 0.00% | 0.08% | 500% |
| FNSXX | Fidelity Investments Money Market Governments Portfolio Institutional Class | 0.18% | 0.00% | 0.18% | VMRXX | Vanguard Prime Money Market Fund Admiral | 0.10% | 0.00% | 0.10% | 80% |
| N/A | Fidelity® Contrafund Commingled Pool | 0.43% | 0.00% | 0.43% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1129% |
| FCNKX | Fidelity® Contrafund® K | 0.65% | 0.20% | 0.45% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1186% |
| N/A | Fidelity® Diversified International Commingled Pool | 0.58% | 0.00% | 0.58% | VIAAX | Vanguard Intl Div Apprec Idx Adm | 0.25% | 0.00% | 0.25% | 132% |
| FDIKX | Fidelity® Diversified International K | 0.82% | 0.20% | 0.62% | VIAAX | Vanguard Intl Div Apprec Idx Adm | 0.25% | 0.00% | 0.25% | 148% |
| FOCKX | Fidelity® OTC Portfolio - Class K | 0.89% | 0.20% | 0.69% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1871% |
| FTBFX | Fidelity® Total Bond Fund | 0.45% | 0.10% | 0.35% | FXNAX | Fidelity® US Bond Index Instl Prem | 0.03% | 0.00% | 0.03% | 1300% |
| VEXRX | Vanguard Explorer Fund Admiral Shares | 0.34% | 0.00% | 0.34% | VSGIX | Vanguard Small Cap Growth Index I | 0.06% | 0.00% | 0.06% | 467% |
| PRFDX | T. Rowe Price Equity Income Fund | 0.64% | 0.15% | 0.49% | FLCOX | Fidelity® Large Cap Value Index Prm Inst | 0.04% | 0.00% | 0.04% | 1300% |

| Defendants' Investment *(continued)* | | | | | Prudent Alternative Investments *(continued)* | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| N/A | T. Rowe Price Retirement 2005 Trust F | 0.43% | 0.00% | 0.43% | FFGFX | Fidelity Freedom® Index 2005 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2010 Trust F | 0.43% | 0.00% | 0.43% | FFWTX | Fidelity Freedom® Index 2010 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2015 Trust F | 0.43% | 0.00% | 0.43% | FIWFX | Fidelity Freedom® Index 2015 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2020 Trust F | 0.43% | 0.00% | 0.43% | FIWTX | Fidelity Freedom® Index 2020 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2025 Trust F | 0.43% | 0.00% | 0.43% | FFEDX | Fidelity Freedom® Index 2025 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2030 Trust F | 0.43% | 0.00% | 0.43% | FFEGX | Fidelity Freedom® Index 2030 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2035 Trust F | 0.43% | 0.00% | 0.43% | FFEZX | Fidelity Freedom® Index 2035 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2040 Trust F | 0.43% | 0.00% | 0.43% | FFIZX | Fidelity Freedom® Index 2040 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2045 Trust F | 0.43% | 0.00% | 0.43% | FFOLX | Fidelity Freedom® Index 2045 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2050 Trust F | 0.43% | 0.00% | 0.43% | FFOPX | Fidelity Freedom® Index 2050 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2055 Trust F | 0.43% | 0.00% | 0.43% | FFLDX | Fidelity Freedom® Index 2055 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| N/A | T. Rowe Price Retirement 2060 Trust F | 0.43% | 0.00% | 0.43% | FFLEX | Fidelity Freedom® Index 2060 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| | *Average* | *0.48%* | *0.03%* | *0.45%* | | *Average* | *0.08%* | *0.00%* | *0.08%* | *663.30%* |

194. During the Class Period and based on the charts above, the average Net Investment Expense to Retirement Plans of the investments selected and made available to Plan Participants by the Plan Fiduciaries identified above was 0.45%, or 45 basis points.

195. During the Class Period and based on the charts above, the investment options selected by the Plan Fiduciaries were 663.30% more expensive than prudent alternative and less

expensive options covering the same asset category that were available to place in the Plan 401(k) investment menu for Plan participants.

196. During the Class Period, Defendants did not engage in an objectively reasonable process when selecting funds for the Plan.

197. During the Class Period and because Defendants did not engage in an objectively reasonable process when selecting funds for the Plan, Defendants actually selected the funds identified in the "Defendants' Investment" column in the charts above.

198. During the Class Period and had Defendants engaged in an objectively reasonable process when selecting funds for the Plan, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

199. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

200. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected funds with lower expense ratios than those funds actually selected by Defendants as identified in the "Defendants' Investment" column in the charts above.

201. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected the funds identified in the "Prudent Alternative Investments" column in the charts above.

202. During the Class Period, Plaintiffs had no knowledge of Defendants' process for selecting investments and regularly monitoring them to ensure they remained prudent.

203. During the Class Period, Plaintiffs had no knowledge of how the fees charged to and paid by the Plan Participants compared to any other funds.

204. During the Class Period, Plaintiffs did not know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants failed to

reasonably offer because Defendants provided no comparative information to allow Plaintiffs to evaluate and compare Defendants' investment options.

205. During the Class Period, Defendants failed to reasonably and properly evaluate the true cost of the services of each portfolio manager under the fee structure negotiated with Fidelity, thereby paying fees that were more than necessary to the detriment of Plaintiffs and the Plan's Participants.

206. During the Class Period and had Defendants chosen investment options similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, the Plan's Participants would have been received the exact same portfolio management services but at a lower cost.

207. During the Class Period and because Defendants imprudently chose investment options that were not similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, Defendants' caused unreasonable and unnecessary losses to Plaintiffs and Plan's Participants.

208. During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart above demonstrates that the expense ratios of the Plan's investment options between the years 2015 to 2020 were more expensive by significant multiples of comparable actively managed and passively managed alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

209. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of funds identified in the "Defendants' Investment" column in the charts above, Plaintiffs and the Plan's Participants incurred actual expenses and costs as identified in the "Actual Investment Lineup" portion of the chart below.

210. During the Class Period and had Defendants acted in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its

investments, Defendants would have prudently chosen lower-cost investment alternatives as identified in the "Alternative Investment Lineup" portion of the chart below.

211. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiffs and the Plan's Participants in the amount of approximately $22,010,792 through 2019 and as detailed in the following chart:

### Investment Fee Detail

| Actual Investment Lineup | | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 |
| Net Investment Expense to Retirement Plans | $3,450,123 | $3,519,256 | $4,519,451 | $3,764,827 | $4,540,099 |
| Prudent Alternative Investments | | | | | |
| Net Investment Expense to Retirement Plans | $550,475 | $587,313 | $736,313 | $668,487 | $814,097 |
| Est. Investment Damages | $2,899,648 | $2,931,943 | $3,783,137 | $3,096,340 | $3,726,003 |
| Compounding Percentage (VIIIX) | | 11.95% | 21.82% | -4.41% | 31.48% |
| Est. Cumulative Investment Damages | $2,899,648 | $6,178,099 | $11,309,298 | $13,906,898 | $22,010,792 |

212. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including but not limited to Plaintiffs' Plan quarterly statements, the Plan's Summary Description, and the Plan's participant fee disclosures.

213. During the entirety of the Class Period and by failing to engage in an objectively reasonable investigation process when selecting its investments, Defendants breached their fiduciary duties of loyalty and prudence to Plaintiffs and Plan Participants.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

214. Defendants retained Fidelity's own subsidiary Strategic Advisors, Inc. ("SAI")—one of the largest managed account service providers in in the industry—to provide managed account services to the Plan.

215. According to Defendants' Participant fee disclosure documents, SAI purported to provide participants with an asset allocation mix of funds available within the Plan.

216. Plan participants were charged 65 basis points on an annual basis for using SAI, which is also labelled Personalized Planning & Advice on the participant financial disclosures.

217. For this service, Defendants required participants to pay an annual fee of at least 0.65%.

218. Companies are not required to publicly disclose the fee rates for managed account services making it difficult to obtain marketplace data.

219. Nevertheless, there are a number of other managed account providers whose services are virtually identical to the services provided to Plan participants through SAI and whose publicly-known fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the Plan. These companies represent the normal range of fees for what is typically charged for managed account services.

220. Similarly, the Kimberly-Clark 401(k) Profit Sharing and Retirement Plan, a similar mega Plan to Juniper, provided in 2020 managed account services through Fidelity/SAI to its participants at a much lower price on the following schedule: no fee up to the first $5000, 0.25% up to $100,000, 0.15% on the next $150,000, and 0.10% on assets greater than $250,000.

221. The fee rates paid by the Plan participants to SAI therefore were excessive and not reasonable given the Plan's massive size and negotiating power.

222. The Plan's managed account services added no material value to participants to warrant any additional fees. The asset allocations created by the managed account services were not materially different than the asset allocations provided by the age-appropriate target date options

ubiquitously available to Defendants in the market and already available to participants in the Juniper Plan.

223. As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 32 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

224. As a result, based on the value provided, the reasonable fee for Plan's managed account service was zero or very close to zero.

225. Additionally, a prudent fiduciary would have conducted periodic cost benchmarking and taken other measures (including issuing an RFP or RFI, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable.

226. Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

227. Alternatively, the excessive fees paid by Plan Participants using the managed account service were not warranted and did not provide any material value or benefit to those Plan Participants

228. The excessive fees paid for the Plan's managed account service cost resulted in Plan Participants paying excessive and unreasonable fees and constitutes a separate and independent breach of fiduciary duty.

## FAILURE TO FULLY DISCLOSE FEES CHARGED OR CREDITED TO THE PLAN INVESTMENTS AND ACCURATE PERFORMANCE INFORMATION OF INVESTMENT OPTIONS

229. ERISA imposes a duty on plan administrators to provide to plan participants on a "regular and periodic basis . . . sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses attendant thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

230. In order to satisfy this requirement, a plan administrator must provide (among other things) (1) an "identification of any designated investment managers," (2) "an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary … not reflected in the total annual operation expenses of any designated investment alternatives," and (3) "at least quarterly, a statement" reflecting the dollar amount and nature of those expenses "actually charged," along with a "description of the services to which the charges relate." 29 C.F.R. § 2550-404a-5(b)-(d).

231. Defendants failed to properly disclose the fees charged to Participants in the Plan in their quarterly statements and 404a-5 participant fee disclosure documents.

232. The Plan's recordkeeper collected revenue sharing on several of the investment options made available to Participants.

233. The Defendants failed to disclose the revenue sharing rates of each investment option to the Participants in its 404a-5 participant fee disclosure documents.

234. As a result, Plan Participants are not able to determine how much they actually paid for the RPS provided by the Defendants' RPSP nor can Plan Participants therefore calculate the net fee they paid for designated investment alternatives.

235. As a result, the Participants were unable to determine the actual Net Investment Expense paid by Retirement Plan Participants for each of their investment options.

236. Moreover, some of the investment options in the plan have different revenue sharing rates than others and some even had no revenue sharing at all.

237. Without knowing the portion of the expense ratio allocable to the RPS services received by the Participants, each Participant could not make "informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

238. The Defendants' failure to disclose the revenue sharing rates associated with each investment option in its 404a-5 participant fee disclosure documents prevented Participants from making "informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

239. For example, if it is critical for a Participant to know the total expense ratio and performance history in order to make an informed investment decision, then it is also critical to know the amount of any credits that could be returned to Participants or could be used to pay for the Plan's administrative expenses. When a rebate is available to reduce the "sticker" price of a product or service, the failure to provide the amount of the rebate prevents a buyer from understanding the net cost of the product or service. It is obvious a prudent buyer of the product or service would need to know whether rebates were available and, if so, the amount of the rebate.

240. The Defendants' incomplete disclosures are a clear violation of the ERISA disclosure requirements imposed on all Plan administrators and are also evidence that the Defendants were imprudent in the administration of the plan.

241. Plaintiffs have been harmed by the Defendants' failure to abide by the requirement to disclose all the information a Participant would need to make an informed investment decision.

242. The failure to disclose all the information a Participant would need to make an informed investment decision, as required under 29 C.F.R. § 2550-404a-5(a), breached the fiduciary obligations of prudence and loyalty that Defendants owed to Plaintiffs and members of the Class.

243. For example, in their Participant Fee Disclosure document, Defendants specifically disclosed that the "Plan's administrative services may also be paid for through offsets and/or payments associated with one or more of the Plan's investment options." Thus, some of the investment options in the plan were paying for RPS while others were not.

244. Moreover, some or all of the revenue sharing was returned to the Plan Participants as a rebate. In that case the performance of the investment options presented in the Participant Fee Disclosure understates the actual performance of some of the investment options selected by the Plan Fiduciaries.

245. Similarly, in their Participant Fee Disclosure document, Defendants specifically state that "the cumulative effect of fees and expenses can substantially reduce the growth of your retirement savings, [sic] but is only one of many factors to consider when you decide to invest in an option." Defendants therefore acknowledge the importance of fees yet fail to provide information on fee rebates which have the effect of reducing the fees paid by Plan Participants.

246. Defendants' failure to disclose the revenue sharing rates clearly violates Defendants' duty to provide (among other things) "(2) an explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary … not reflected in the total annual operation expenses of any designated investment alternatives." A fee rebate can be viewed as a negative fee, and it incontrovertibly improves the performance of the investment option and is "not reflected in the total annual operation expense of that designated investment alternative." 29 C.F.R. § 2550- 404a-5(b)-(d).

247. Plan Participants have thus been damaged through Defendants' incomplete and erroneous disclosures, which breached Defendants' fiduciary duties to Plaintiff and members of the Class.

## **CLASS ACTION ALLEGATIONS**

248. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

249. In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

All participants and beneficiaries of the Juniper Networks, Inc. 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning August 11, 2015, and running through the date of judgment.

250. The Class includes almost 7,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

251. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owes fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

252. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

253. Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were Participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

254. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan

would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

255. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

256. Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

257. The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

258. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

259. Any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against All Defendants – RPS Fees)**

260. Plaintiffs restate the above allegations as if fully set forth herein.

261. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

262. 29 U.S.C. § 1104 imposes fiduciary duty of prudence upon Defendants in their administration of the Plan.

263. Defendants, as fiduciaries of the Plan, are responsible for selecting a RPSP that charges reasonable RPS fees.

264. During the Class Period, Defendants had fiduciary duties to do all of the following: ensure that the Plan's RPS fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

265. During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiffs, by failing to: ensure that the Plan's RPS fees were reasonable, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

266. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's RPSP to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding RPS and the significant bargaining power the Plan had to negotiate the best fees.

267. During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiffs, by failing to employ a prudent process and by failing to critically or objectively evaluate the cost and performance of the Plan's RPSP in comparison to other RPSP options.

268. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

269. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

270. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

271. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class,**
**Against All Defendants – Managed Account Service Fees)**

272. Plaintiffs restate the above allegations as if fully set forth herein.

273. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

274. 29 U.S.C. § 1104 imposes fiduciary duty of prudence upon Defendants in their administration of the Plan.

275. Defendants, as fiduciaries of the Plan, are responsible for selecting a managed account service provider that charges reasonable managed account service fees.

276. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

277. During the Class Period, among other things, Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses. Each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to defray reasonable expenses of the Plan, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like

capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of their fiduciary.

278. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's managed account providers to make sure they were providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

279. During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiffs, by failing to employ a prudent process by failing to critically or objectively evaluate the cost and performance of the Plan's managed account providers in comparison to other managed account options.

280. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

281. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

282. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

283. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

## THIRD CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Plaintiffs, on behalf of themselves and Class, Against All Defendants – Investment Management Fees)

284. Plaintiffs restate the above allegations as if fully set forth herein.

285. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

286. 29 U.S.C. § 1104 imposes fiduciary duty of prudence upon Defendants in managing the investments of the Plan.

287. Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

288. During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

289. During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiffs, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

290. Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

291. During the Class Period, Defendants breached their fiduciary duty of prudence to Plan Participants, including Plaintiffs, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

292. Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an

ongoing basis and eliminating funds or share classes that did not serve the best interest of Plan Participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

293. Defendants failed to employ a prudent process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

294. Through these actions and omissions, Defendants fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

295. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

296. As a result of Defendants' breach of their fiduciary duty of prudence with respect to the Plan, as aforesaid, the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

297. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class,**
**Against Defendants Juniper and Board – RPS Fees)**

298. Plaintiffs restate the above allegations as if fully set forth herein.

299. Defendants Juniper and Board had the authority to appoint and remove members or individuals on the Committee responsible for Plan RPS fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

300. In light of this authority, Defendants Juniper and Board had a duty to monitor those individuals on the Committee responsible for Plan RPS fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

301. Defendants Juniper and Board had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants Juniper and Board.

302. The excessive RPS fees paid by the Plan inferentially suggest that Juniper and the Board breached their duty to monitor the Committee by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan RPS fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RPS expenses;

b. Failing to monitor the process by which the Plan's RPSP were evaluated and failing to investigate the availability of lower-cost RPSP; and

c. Failing to remove individuals responsible for Plan RPS fees whose performance was inadequate in that these individuals continued to pay the same RPS costs even though benchmarking and using other similar comparators would have showed that maintaining Fidelity as the RPSP at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

303. As the consequences of the foregoing breaches of the duty to monitor for RPS fees the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

304. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Juniper and Board are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RPS fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### FIFTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of themselves and Class,**
**against Defendants Juniper and Board – Managed Account Service Fees)**

305. Plaintiffs restate the above allegations as if fully set forth herein.

306. Defendant Juniper, through its Board, had the authority to appoint and remove some of the members or individuals on the Committee responsible for Plan managed account service fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

307. In light of this authority, Juniper, through its Board, had a duty to monitor those individuals on the Committee responsible for Plan managed account service fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

308. Juniper, through its Board, had a duty to ensure that the individuals responsible for Plan administration on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Juniper.

309. The excessive managed account fees paid by the Plan inferentially suggest that Juniper and the Board breach their duty to monitor the individuals they appointed to the Committee, by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan managed account service fees or have a system in place for doing so, standing idly by

as the Plan suffered significant losses in the form of unreasonably high managed account service expenses;

b.  Failing to monitor the process by which Plan managed account providers were evaluated and failing to investigate the availability of lower-cost managed account providers; and

c.  Failing to remove individuals responsible for Plan managed account service fees whose performance was inadequate in that these individuals continued to pay the same managed account service costs even though benchmarking and using other similar comparators would have showed that maintaining their managed account providers was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

310. As the consequences of the foregoing breaches of the duty to monitor for managed account service fees, the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

311. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Juniper and Board are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account service fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### SIXTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of themselves and Class,**
**Against Defendants Juniper and Board – Investment Management Fees)**

312. Plaintiffs restate the above allegations as if fully set forth herein.

313. Juniper, through its Board, had the authority to appoint and remove members or individuals on the Committee responsible for Plan investment management and were aware that these fiduciaries had critical responsibilities for the Plan.

314. In light of this authority, Juniper, through its Board, had a duty to monitor those individuals responsible for Plan investment management on the Committee to ensure that they were

adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

315. Juniper, through its Board, had a duty to ensure that the individuals responsible for Plan investment management on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants Juniper and Board.

316. The excessive investment management fees paid by the Plan, in the form of improper share classes and high cost funds, inferentially suggest that Juniper and the Board breached their duty to monitor the individuals they appointed to the Committee, by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses with regard to share classes, and inefficient fund management styles that adversely affected the investment performance of the funds' and their Participants' assets as a result of these individuals responsible for Plan imprudent actions and omissions;

b. Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost share classes, and failing to investigate the availability of lower-cost funds and collective trusts; and

c. Failing to remove individuals responsible for Plan administration whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan Participants' retirement savings.

317. As a result of Defendants Juniper and Board's foregoing breaches of the duty to monitor, the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

318.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Juniper and Board are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan administration. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.     An Order requiring Defendant Juniper to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Juniper as necessary to effectuate relief, and to prevent Juniper' unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 6th day of December, 2021

*s/ Joseph A. Creitz*

Joseph A. Creitz                           James A. Walcheske*
CREITZ & SEREBIN LLP                       Scott S. Luzi
100 Pine Street, Suite 1250                Paul M. Secunda*
San Francisco, CA 94111                      * admitted *pro hac vice*
Telephone: (415) 466-3090                  WALCHESKE & LUZI, LLC
Fax: (415) 513-4475                        235 N. Executive Dr., Suite 240
Email: joe@creitzserebin.com               Brookfield, Wisconsin 53005
                                           Telephone: (262) 780-1953
                                           Fax: (262) 565-6469
                                           E-Mail: jwalcheske@walcheskeluzi.com
                                           E-Mail: sluzi@walcheskeluzi.com
                                           E-Mail: psecunda@walcheskeluzi.com

                                           Counsel for Plaintiffs